**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**EL PASO DIVISION**

| | | |
|---|---|---|
| **RAYMUNDO SALCEDO,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **EP-10-CV-363-KC** |
| | § | |
| **EVANSTON INSURANCE CO.,** | § | |
| | § | |
| **Defendant**. | § | |

## ORDER

On this date, the Court considered "Plaintiff's First Amended Motion for Summary

Judgment" ("Plaintiff's Motion"), ECF No. 19, and Defendant's Motion for Summary Judgment

("Defendant's Motion"), ECF No. 22. For the reasons set forth below, Plaintiff's Motion is

**DENIED** and Defendant's Motion is **GRANTED**.

## I.    BACKGROUND

The following facts are undisputed.

In February 2008, Villegas & Sons ("Villegas") was operating an asphalt plant. Pl.'s

Proposed Undisputed Facts ("Facts") ¶ 11, ECF No. 28; Pl.'s Mot. Ex. B ("Final Judgment"), at

1, ECF No. 19-2. The asphalt plant included a reservoir for oil with an attached pump and was

not self-propelled. Facts ¶ 8. In 2006, the plant was towed to the location where it was located

on the day of Plaintiff's injury. *Id.* After it was put in place, the wheels were taken off the

pump/reservoir portion of the plant. *Id.* On the day of Plaintiff's accident the pump/reservoir of

the asphalt plant did not have wheels and could not have been towed. *Id.*

On the morning of February 19, 2008, Plaintiff was engaged in unloading hot oil from a

supply company's oil tank truck into the asphalt plant by means of a hose. *Id.* ¶¶ 6-7, 10. The hose and asphalt plant were under the control and possession of Villegas. *Id.* ¶ 11. In the course of preparing the asphalt plant that morning, Plaintiff checked the hose connection to the pump and signaled to his co-worker that it was fastened. *Id.* ¶ 12. The co-worker then turned on the pump in order to unload the hot oil from the truck into the reservoir on the plant. *Id.* ¶ 13. The valve of the pump malfunctioned, causing backpressure at the valve and a resulting rupture in the hose. *Id.* ¶ 14. As a result of the rupture, hot oil sprayed out of the hose onto Plaintiff, causing severe burns. *Id.* ¶ 16.

At the time of the accident, Villegas held a Commercial General Liability ("CGL") insurance policy ("the Policy") with Defendant. Facts ¶ 1. Under the Policy, Defendant was required to defend and indemnify Villegas against suits based on certain bodily injuries. Pl.'s Mot. Ex. A ("Policy"), at 12, ECF No. 19-1. The Policy also specified, however, that Defendant need not defend or indemnify Villegas against suits for injuries "arising out of, caused by, or contributed to by the ownership, non-ownership, maintenance, use, or entrustment to others of any aircraft, 'auto,' or watercraft. Use includes operation and 'loading and unloading.'" Policy 35. Auto was specifically defined in the Policy as "a land motor vehicle, trailer, or semi-trailer designed for travel on public roads, including any attached machinery or equipment. But 'auto' does not include 'mobile equipment.'" *Id.* at 20. The parties have stipulated that the oil tank truck involved in the accident qualifies as an auto, as that term is defined and used in the Policy. Facts ¶ 9. In a separate section, the Policy added that "auto" would also include "self-propelled vehicles with . . . permanently attached . . . [c]herry pickers and similar devices mounted on automobile or truck chassis and used to raise or lower workers[,] [a]ir compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and

well servicing equipment." Policy 22. However, the Policy specified that this additional category of autos would still be covered, despite the auto exclusion. *Id.* at 14.

Plaintiff filed a tort suit against Villegas and other parties for redress for his injuries. Facts ¶ 3; Final J. 1. Villegas asked Defendant to defend and indemnify it under the Policy, but Defendant refused, claiming that the Policy did not apply to the accident because the accident arose from the use of an auto. Pl.'s Mot. 6. The other parties settled, and Plaintiff and Villegas tried the case before a judge in Texas state court in June 2010, with Villegas providing its own defense. Final J. 1. Based on a finding that Villegas "was negligent in operating and maintaining the asphalt plant at the time of Plaitniff's [sic] injuries, and that such negligence was a proximate cause of Plaintiff's injuries," the court awarded Plaintiff $1.1 million from Villegas. *Id.* at 2.

In exchange for a $100,000 reduction in the damages award, Villegas assigned to Plaintiff Villegas's claim against Defendant under the Policy. Pl.'s Mot. Ex. C, ECF No. 19-3. Plaintiff then filed a breach of contract claim in Texas state court to collect the proceeds of the Policy on Villegas's behalf, which Defendant removed to this Court. Notice of Removal Ex. A; Notice of Removal.

Presently before the Court are the parties' cross-motions for summary judgment. Plaintiff seeks a ruling that Defendant owes him the amount of his judgment against Villegas, minus the discount given to Villegas in consideration for the assignment of its rights under the Policy. Pl.'s Mot. 15. Defendant seeks a ruling that there is no coverage for Plaintiff's injuries under the Policy, and that Plaintiff should therefore receive a take-nothing judgment. Def.'s Mot. 22.

## II.    DISCUSSION

### A.    Summary Judgment Standard

Summary judgment is required "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Weaver v. CCA Indus., Inc.*, 529 F.3d 335, 339 (5th Cir. 2008).  "A fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit under governing law." *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 326 (5th Cir. 2009) (quoting *Hamilton v. Segue Software, Inc.*, 232 F.3d 473, 477 (5th Cir. 2000) (per curiam)).  A dispute about a material fact is genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Ellison v. Software Spectrum, Inc.*, 85 F.3d 187, 189 (5th Cir. 1996).

"[The] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323; *Wallace v. Tex. Tech. Univ.*, 80 F.3d 1042, 1046-47 (5th Cir. 1996).  To show the existence of a genuine dispute, the nonmoving party must support its position with citations to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials[,]" or show "that the materials cited by the movant do not establish the absence . . . of a genuine dispute, or that [the moving party] cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c).  The court resolves factual controversies in favor of the nonmoving party; however, factual controversies require more than "conclusory

4

allegations," "unsubstantiated assertions," or "a 'scintilla' of evidence." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc). Further, when reviewing the evidence, the court must draw all reasonable inferences in favor of the nonmoving party, and may not make credibility determinations or weigh evidence. *Man Roland, Inc. v. Kreitz Motor Express, Inc.*, 438 F.3d 476, 478-79 (5th Cir. 2006) (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000)). Thus, the ultimate inquiry in a summary judgment motion is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52.

**B.     Interpretation of Insurance Policies**

Plaintiff has moved for summary judgment that Defendant owed a duty to Villegas to indemnify it under the Policy for the tort award based on Plaintiff's injuries, and that through the assignment of Villegas's rights, Defendant now owes that duty to Plaintiff. Pl.'s Mot. 6-7. Defendant argues that it does not owe a duty to indemnify under the Policy because the tort award falls within the exclusion for damages from accidents arising from the use of an auto, based on the fact that the accident happened while the oil truck was being unloaded. Def.'s Mot. 7-10. Plaintiff argues in turn that the auto exclusion does not apply to defeat coverage because the accident was not caused by a defect in the truck or negligence in its operation. *See* Pl.'s Mot. 9-12.

Plaintiff also argues that if the auto exclusion does apply, the exclusion is defeated because the accident arose out of the use of the asphalt plant, and damages from uses of such equipment are excepted from the reach of the exclusion. *See* Pl.'s Mot. 7-9. Defendant has responded that the exception cited by Plaintiff does not apply because the asphalt plant does not qualify as the relevant type of equipment excepted from the exclusion. Def.'s Mot. 10-12.

Defendant also argues that even if the plant did qualify as excepted equipment, where an accident arises from two concurrent causes, one of which is covered and one of which is not, there is no coverage under the Policy. *Id.* at 13.

As a result of these cross-motions, the sole issues before the court are whether the accident is excluded from coverage because it arises out of the unloading of the oil truck, and if so, whether the exception to the auto exclusion applies to bring the accident back into coverage.

The Court is exercising its diversity jurisdiction, and so applies Texas substantive law to this case. *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78-80 (1938); *Holt v. State Farm Fire & Cas. Co.*, 627 F.3d 188, 191 (5th Cir. 2010). The placement of the burden and weight of proving the validity of claims is a matter of state law. *See Computer Econ., Inc. v. Gartner Grp., Inc.*, 50 F. Supp. 2d 980, 990-91 (S.D. Cal. 1999) ("State rules that define the elements of a cause of action, affirmative defenses, presumptions, burdens of proof, and rules that create or preclude liability are so obviously substantive that their application in diversity actions is required.") (citing, inter alia, *Guaranty Trust Co. of N.Y. v. York*, 326 U.S. 99, 109-11 (1945) (federal court must apply state law specifying length of applicable statute of limitations); *Dick v. N.Y. Life Ins. Co.*, 359 U.S. 437, 446-47 (1959) (federal court must apply state law presumptions and burdens of proof)).

Under Texas law, in determining whether an insurance company has a duty to indemnify, the insured has the initial burden of establishing coverage under the terms of the policy. *Gilbert Tex. Constr., L.P. v. Underwriters at Lloyd's London*, 327 S.W.3d 118, 124 (Tex. 2010) (citing *Ulico Cas. Co. v. Allied Pilots Ass'n*, 262 S.W.3d 773, 782 (Tex. 2008)). "If the insured proves coverage, then to avoid liability the insurer must prove the loss is within an exclusion." *Id.* (citing *Allied Pilots*, 262 S.W.3d at 782). "If the insurer proves that an exclusion applies, the

burden shifts back to the insured to show that an exception to the exclusion brings the claim back within coverage." *Id.* (citing *Comsys Info. Tech. Servs., Inc. v. Twin City Fire Ins. Co.*, 130 S.W.3d 181, 193 (Tex. App. 2003); *Century Sur. Co. v. Hardscape Constr. Specialties, Inc.*, 578 F.3d 262, 265 (5th Cir. 2009)).  When adjudicating duties to indemnify, courts apply the insurance policy terms to the facts established in the underlying action, rather than to the allegations made by the plaintiff in the complaint.  *D.R. Horton-Texas, Ltd. v. Markel Int'l Ins. Co., Ltd.*, 300 S.W.3d 740, 744 (Tex. 2009); *see also Northfield Ins. Co. v. Loving Home Care, Inc.*, 363 F.3d 523, 528-29 (5th Cir. 2004) ("'the duty to indemnify is not based on the third party's allegations, but upon the actual facts that underlie the cause of action and result in liability'") (quoting *Canutillo Indep. Sch. Dist. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 99 F.3d 695, 701 (5th Cir. 1996) (citations omitted)).

In general, insurance policies are interpreted using general principles of contract construction in order to ascertain the parties' intent.  *Gilbert*, 327 S.W.3d at 126. "Fundamentally, . . .  the issue is what coverage is intended to be provided by insurers and acquired and shared by premium-payers."  *Mid-Century Ins. Co. of Tex. v. Lindsey*, 997 S.W.2d 153, 158 (Tex. 1999).  The language of the policy is the starting point, and policy terms "are given their ordinary and generally-accepted meaning unless the policy shows the words were meant in a technical or different sense."  *Id.* (citing *Don's Bldg. Supply, Inc. v. OneBeacon Ins. Co.*, 267 S.W.3d 20, 23 (Tex. 2008)).  Courts should avoid remaking the parties' bargain by reading terms into or out of the contract.  *Id.*

Courts regularly interpret ambiguous insurance policies to favor the insured, for public policy reasons or because insurance companies generally draft the policies and contracts are to be construed against the drafter.  *U.S. Fidelity & Guaranty Co. v. Bimco Iron & Metal Corp.*,

464 S.W.2d 353, 355 (Tex. 1971); 2 Lee R. Russ, *Couch on Ins.* ("*Couch*") § 22:14 (3d ed. 1997). Terms that are ambiguous, meaning that they are "susceptible to two or more reasonable interpretations," are interpreted by looking at their effect. *Lincoln Gen. Ins. Co. v. Aisha's Learning Ctr.*, 468 F.3d 857, 859 (5th Cir. 2006). If an ambiguous term is in a coverage section, it is construed broadly, and if in an exclusion section, narrowly, all in order to increase the scope of coverage. *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Hudson Energy Co., Inc.*, 811 S.W.2d 552, 555 (Tex. 1991); *see also Grain Dealers Mut. Ins. Co. v. McKee*, 943 S.W.2d 455, 458 (Tex. 1997) ("the interpretation [of an ambiguous policy] that most favors coverage for the insured will be adopted"); *Aisha's Learning*, 468 F.3d at 859 (ambiguous policies to be strictly construed to avoid exclusions from coverage). Stated more succinctly, the rule of construction for insurance policies is that the court "must adopt the construction of an exclusionary clause urged by the insured as long as that construction is not unreasonable, even if the construction urged by the insurer appears to be more reasonable or a more accurate reflection of the parties' intent." *Hudson*, 811 S.W.2d at 555.

### 1. Arising out of the use of an auto

With these interpretive principles in mind, the Court now turns to the Policy at issue here. The parties do not dispute initial coverage under the Policy, so the Court begins with the question of whether the accident falls within the exclusion for accidents arising out of the use of an auto. The parties have stipulated that the oil tank truck from which the oil flowed was an auto, and the Policy itself states that "use" includes unloading. Therefore, the issue may be restated as a question of whether the accident "arose out of" the unloading of the truck.

At the outset, the Court notes that the interpretive principles requiring the Court to give effect to any reasonable interpretation offered by Plaintiff and to construe the Policy against the

insurer do not operate here. Those principles only apply if the relevant term to be interpreted is ambiguous, meaning susceptible of two reasonable interpretations. *See Aisha's Learning Ctr.*, 468 F.3d at 859. But the term "arising out of" in the Policy is not ambiguous. As a leading insurance law treatise states, "The phrase 'arising out of the use' of an insured vehicle is broad in scope, but it is not itself ambiguous so as to bring into play the rule of adverse construction against the insurer." 8A *Couch* § 22:14. So, while the burdens of proof shift depending on whether the Court is interpreting language in a coverage, exclusion, or exception section, the strictness of the Court's construction does not.

Additionally, "when parties to an insurance contract use language which has been held by the courts to have a certain meaning, they intend to give that meaning to the language." *Vanguard Ins. Co. v. Plains Helicopter, Inc.*, 529 S.W.2d 277, 279 (Tex. Civ. App. 1975) (citation omitted); 2 *Couch* § 22:40 ("While words should be given their ordinary meaning, they must be construed in accordance with established rules of law even though the insured may not be familiar with their legal meaning."). The Policy is based on a standard CGL policy form, and the relevant language has been interpreted by Texas courts numerous times, so the Court interprets the Policy in light of prior cases construing identical language.

To determine whether an injury arises out of the use of an auto, the Texas Supreme Court has instructed courts to employ the test set forth in an insurance law treatise:

> For an injury to fall within the "use" coverage of an automobile policy (1) the accident must have arisen out of the inherent nature of the automobile, as such, (2) the accident must have arisen within the natural territorial limits of an automobile, and the actual use must not have terminated, (3) the automobile must not merely contribute to cause the condition which produces the injury, but must itself produce the injury.

*Lindsey*, 997 S.W.2d at 157 (quoting 8 *Couch* § 119.37).[1]

The Texas Supreme Court has, however, qualified its endorsement of this test by noting that it did not consider the three-factors to be an "absolute test." *Id.* The Texas Supreme Court also observed that the three factors were "unavoidably abstract," and that the third factor was "especially troublesome because of the difficulty in many circumstances of deciding what role a vehicle, as opposed to other things, played in producing a particular injury." *Id.* However, the court found that third factor "[did] not create this difficulty . . . , but simply expose[d] it in the arising-out-of-use test for coverage," and acknowledged that the "degree of the vehicle's involvement in the production of the injury is a difficult factor to judge." *Id.* at 158. The Texas Supreme Court has since clarified the causation required by the third factor, stating that "'arise out of' means that there is simply a causal connection or relation, which is interpreted to mean that there is but for causation, though not necessarily direct or proximate causation." *Mid-Continent Cas. Co. v. Global Enercom Mgmt., Inc.*, 323 S.W.3d 151, 156 (Tex. 2010) (per curiam) (quotation omitted). An injury does not arise out of the use of an auto "if a vehicle is only the locational setting for an injury." *Lindsey*, 997 S.W.2d at 156 (citing *LeLeaux v. Hamshire-Fannett Indep. Sch. Dist.*, 835 S.W.2d 49, 51-52 (Tex. 1992)). In general, though, the term "use" is interpreted broadly, as a general catchall provision. *Aisha's Learning*, 468 F.3d at 859 (quotations omitted).

      Under this test, the Court must conclude that Plaintiff's injuries arose out of the

---

[1] Texas courts interpret "arise out of" as having the same meaning in the coverage section of an auto liability policy as it does in the exclusion section of a CGL policy, so the Court cites to both kinds of cases without distinction. *Compare Lindsey*, 157 S.W.3d 153 (construing the term in the uninsured motorist coverage section of an auto policy) *with Mid-Continent Cas. Co. v. Global Enercom Mgmt., Inc.*, 323 S.W.3d 151, 152-56 (Tex. 2010) (per curiam) (citing *Lindsey* in construing the term in an exclusion section of a CGL policy).

unloading of the truck. The first element is whether the accident arose out of the inherent nature of the automobile. *See Lindsey*, 997 S.W.2d at 157. The *Lindsey* court sharpened the inquiry on this issue, quoting another insurance law treatise to the effect that use "'means the use of a vehicle as such and does not include a use which is foreign to a vehicle's inherent purpose but to which a vehicle might conceivably be put.'" *Id.* at 156 n.11 (quoting 6B John A. Appleman, *Insurance Law and Practice* (Buckley ed.) § 4316, at 356 (1979)). A truck is intended by its nature to carry cargo, and that this truck was carrying a specific type of cargo in a specific type of reservoir does not change the analysis. It takes no imagination to conceive that a truck with a tank capable of holding hot oil would be used to transport and unload hot oil; that is precisely the inherent purpose of such a truck. Additionally, the Policy itself recognizes that autos may be used to transport cargo in its specification that "use" includes loading and unloading. Therefore, the first element is met.

The Court turns now to the first aspect of the second element, whether the accident arose within the automobile's natural territorial limits. *See Lindsey*, 997 S.W.2d at 157. In *Lindsey*, for example, a child crawling into a truck caused a gun to discharge and injure someone in an adjacent vehicle. *Id.* at 158-59. Without any discussion, the court found that the injuries in the adjacent vehicle were covered by the policy on the truck, which meant the court necessarily found the accident occurred within the territorial limits of the insured truck. The court in *Global Enercom* reached a similar conclusion on facts more analogous to the present case. *See Global Enercom*, 323 S.W.3d at 151. There, a truck was used to pull on a rope and raise workers in a bucket eighty feet into the air, so that they could work on a cell phone tower. *Id.* at 152-53. The rope broke, and the workers were killed. *Id.* at 153. The insurance company for the workers' employer's CGL policy argued that the accident was excluded from coverage by the auto

exclusion clause in the employer's CGL policy because the accident arose from the use of the truck. *Id.* The court agreed, holding that the accident was within the territorial limits of the truck because the policy specified that auto included "attached machinery and equipment" and the bucket holding the workers was attached to the truck by the rope. *Id.* at 155. Here, the accident occurred in close physical proximity to the truck—mere feet away, just as in *Lindsey*. When the accident occurred the truck was attached to the asphalt plant by a hose, and defects in the asphalt plant pump and the hose directly caused the accident, just as in *Global Enercom* the truck was attached to a rope and the rope appears to have directly caused the accident. Therefore, the accident occurred within the territorial limits of the vehicle; the first aspect of the second element is met.

The Court next examines the second aspect of the second element, whether the use of the automobile had ended. *See Lindsey*, 997 S.W.2d at 157. The relevant use of the truck was the unloading of hot oil. The undisputed facts do not indicate precisely how long the pump on the asphalt plant had been running when the accident occurred, but it appears that the accident happened soon after the pump first started to run. *See* Facts ¶¶ 13-14. In any event, the parties have stipulated that the truck was being unloaded when the injuries occurred, *id.* ¶ 10, so the Court concludes the use had not terminated. The second aspect of the second element of the "arise out of" test is met.

The third element is more difficult to apply, but the Court finds it is satisfied on these facts. To restate the element, Defendant must prove that the use of the auto did "not merely contribute to cause the condition which produce[d] the injury, but . . . itself produce[d] the injury." *Lindsey*, 997 S.W.2d at 157. The necessary type of causation for this element is "but for" causation. *Enercom*, 323 S.W.3d at 156 ("'arise out of' means that there is simply a causal

connection or relation, which is interpreted to mean that there is but for causation, though not necessarily direct or proximate causation") (quotation omitted). As specified in the Policy, "[u]se includes operation and 'loading and unloading.'" Policy 14. Thus, to prove the exclusion applies, Defendant must prove that the unloading produced the injury, not just the conditions that produced the injury.

The parties have stipulated that the pump was used to unload the truck. Facts ¶¶ 6-7, 10. In other words, the pumping of the oil from the truck constituted the act of unloading the truck of its cargo. The parties further agree that it was the pumping process that produced Plaintiff's injuries, rather than just the conditions for the injuries to occur. *Id.* ¶ 14; Pl.'s Mot. 11 ("The hose ruptured because of the defective pump switch and the poorly maintained hose itself."). In other words, "but for" the pumping, the accident would not have occurred. Putting these facts together, the parties agree that the use of the truck was the unloading, the unloading was the pumping, and the pumping caused Plaintiff's injuries. Therefore, the use of the truck produced Plaintiff's injuries; it did not merely contribute to cause the conditions that produced Plaintiff's injuries.

To avoid this result, Plaintiff seeks to closely parse the element of causation in order to differentiate between the implements used to unload the truck and the truck itself. Plaintiff correctly points out that there was nothing about the truck itself that appears to have caused the accident, that instead the defective pump on the asphalt plant was the root of the accident. Pl.'s Mot. 11. Plaintiff then argues that the injuries were not caused by a use of the truck because no part of the truck or operation of equipment physically located on the truck caused the accident. *Id.* But this argument ignores the fact that the unloading of the truck was itself a use of the truck; using the pump to unload the oil from the truck, was, by operation of the loading and

unloading clause of the Policy, a use of the truck.  The precise reason why the unloading process

caused the injuries, whether because of a malfunction by the truck itself or by some implement

used to accomplish the unloading, is irrelevant.  The unloading process still caused Plaintiff's

injuries, which is all that Texas law requires.  The causation inquiry cannot be split so finely.

    The approach the Court takes is consistent with that taken by the Texas Supreme Court.

In *Global Enercom*, the Fourteenth Court of Appeals had focused narrowly on the snapping of

the rope holding the workers in the air, and concluded that "the pick-up truck did not cause the

deaths of the three workers, the defective rope did."  *Mid-Continent Cas. Co. v. Global Enercom

Mgmt., Inc.*, 293 S.W.3d 322, 327 (Tex. App. 2009), *rev'd*, 323 S.W.3d 151 (Tex. 2010).  In

reversing, the Texas Supreme Court looked more broadly at causation by the use of the truck,

instead of narrow causation by the truck itself.  As the Texas Supreme Court put it,

> [T]he workers could not have been raised on the rope through the pulley system
> without the use of mechanical assistance . . . . The accident did not merely happen
> because the rope broke; the accident did not merely happen in or near the truck;
> the workers could not have accomplished the same result without the truck; and
> one of the expected purposes of this particular truck was to perform towing and
> lifting activities.

*Global Enercom*, 323 S.W.3d at 156.

Like the appellate court, Plaintiff seeks to define causation narrowly, by examining whether the

precise, direct mechanism by which the accident occurred was the truck itself.  Because the

pump and hose were the most direct causes of the accident, and they are not part of the truck,

under Plaintiff's theory, the truck did not cause the accident.  Pl.'s Mot. 11.  However, just as the

Texas Supreme Court did in *Global Enercom*, this Court must focus instead on the use of the

truck, not the truck alone.  Here, the pumping of the oil out of the truck, i.e., the unloading of the

truck, was the relevant use of the truck, Plaintiff could not have accomplished the same result

without the truck, and one of the expected purposes of this truck was to unload hot oil into the

asphalt plant.  But for the pumping/unloading, the hose would not have sprayed hot oil onto

Plaintiff, so the pumping caused the accident.  The use of the truck was more apparent in *Global*

*Enercom* because it was an active use of the truck, in that the truck was moving backwards

putting tension on the rope.  Here, by contrast, the use of the truck is passive, in that the truck

was inert while the pump took the oil out of the truck and fed it into the asphalt plant.  However,

because the Policy specifies that unloading is a use of the truck, this is a distinction without

difference.  In *Global Enercom* the rope snapping was the root cause of the problem, and here

the defective pump was the root cause of the accident, but in neither case is the root cause

relevant.  That the use of the auto, in its broad legal sense, caused the injuries is what is

significant.

### 2. Complete operation doctrine

Plaintiff's contention that the pumping equipment should be viewed separately from the

truck is also foreclosed by Texas's adoption of the complete operation doctrine.  The complete

operation doctrine holds that "'loading and unloading' embrace, not only the immediate

transference of the goods to or from the vehicle, but the 'complete operation' of transporting the

goods between the vehicle and the place from or to which they are being delivered."  *Travelers*

*Ins. Co. v. Emp'rs Cas. Co.*, 380 S.W.2d 610, 612 (Tex. 1964) (quotation omitted).  The delivery

term in the complete operation doctrine refers "not to the legal transfer of title, control, or risk of

loss but to the physical placing of the articles at the point where the unloading process may,

under the facts of the particular case, be regarded as complete."  *Id.* at 614.  Thus, under the rule,

any activities involved in moving the goods to their final physical destination are themselves

included in the term unloading, and thus such activities also qualify as a use of the vehicle for

insurance purposes.

Texas Supreme Court precedent applying the complete operation doctrine leaves no doubt about how the doctrine applies here. *Travelers Insurance* and a later case affirming the complete operation doctrine, *Commercial Standard Insurance Company v. American General Insurance Company*, involved essentially identical facts to each other, and those facts are closely analogous to the facts here. *See Commercial Standard Ins. Co. v. Am. Gen. Ins. Co.*, 455 S.W.2d 714, 716-17 (Tex. 1970); *Travelers Insurance*, 380 S.W.2d at 613. In both cases, concrete was being delivered to a job site to be used in a foundation. *Commercial Standard*, 455 S.W.2d at 715; *Travelers Insurance*, 380 S.W.2d at 613. The concrete arrived at the construction site in a truck and was pumped from the truck into a bucket on a crane operated by a third-party contractor, and then the bucket was lifted above the foundation and emptied. *Commercial Standard*, 455 S.W.2d at 715; *Travelers Insurance*, 380 S.W.2d at 613. In both cases, after some concrete had been unloaded in this fashion but before the truck was completely empty, the crane carrying a bucketful of concrete collapsed over the foundation, injuring the workers below. *Commercial Standard*, 455 S.W.2d at 715; *Travelers Insurance*, 380 S.W.2d at 613. After the crane operator's insurance company settled claims brought by the injured workers, the crane operator's insurance company sued for reimbursement under the concrete truck's automobile policy. *Commercial Standard*, 455 S.W.2d at 715; *Travelers Insurance*, 380 S.W.2d at 611.

Applying the complete operation doctrine, the Texas Supreme Court held that the crane operator was using the truck, and so was covered under the truck's insurance policy as an additional insured, because it was unloading the truck. *Commercial Standard*, 455 S.W.2d at 717; *Travelers Insurance*, 380 S.W.2d at 614. In language from *Travelers Insurance* later quoted with approval in *Commercial Standard*, the Texas Supreme Court held,

When a vehicle is being unloaded it is being used to the same extent as if it were

16

> being driven, and the person doing the unloading is entitled to the same protection
> as the owner or operator. In this instance the accident resulted from the collapse
> of the crane which was transporting concrete from the truck to the forms. Since
> the injuries arose out of the use (unloading) of the vehicle, it is our opinion that
> [the crane operator] was, as a matter of law, entitled to the protection afforded by
> the policy covering the truck.

*Travelers Insurance*, 380 S.W.2d at 614; *see also Commercial Standard*, 455 S.W.2d at 717 (quoting same).

The parallels between these cases and the present facts are plain. There, the crane was the mechanism used to unload the concrete truck, and that mechanism caused the injury. Here, the defective pump was the mechanism used to unload the oil truck, and that mechanism caused the injury. Since the Texas Supreme Court held that the injuries from the collapsing crane arose from the use of the concrete truck, so must this Court hold that the injuries from the malfunctioning pump and rupturing hose arise from the use of the oil truck.

Plaintiff's two arguments attempting to avoid the effect of the complete operation doctrine are further foreclosed by the court's holdings in these cases. First, Plaintiff argues now that the auto itself must cause the injury, and that malfunctions in the equipment used to unload the auto are not sufficient to make the injury arise from the unloading. But the Texas Supreme Court has already rejected this exact argument. Consistent with its later opinions in *Lindsey* and *Global Enercom*, the Texas Supreme Court apparently agreed with the concrete truck insurer that a "causal relation or connection" between the truck and the accident was necessary, but went on to instruct, "This does not mean that the accident must be caused by negligent operation of the vehicle or some defect therein." *Travelers Insurance*, 380 S.W.2d at 614. Instead, it was enough that the implement used to unload the vehicle was the source of the accident, as that meant that the accident arose from the complete operation of unloading the vehicle. *See id.*

Second, Plaintiff argues that the "truck company's unloading process had ended once it

delivered its product to the receiving point of Villegas & Sons —which was the end of Villegas' hose." Pl.'s Resp. to Def.'s Mot. 10, ECF No. 31. Plaintiff points out a valid uncertainty in the application of the complete operation doctrine here, as the record is unclear at present as to what would constitute the final delivery point for the oil. In *Travelers Insurance* and *Commercial Standard*, the Court found that the concrete by its nature could not be stored, so that the final delivery point was necessarily the place where it was ultimately to be used - the foundation forms. *Commercial Standard*, 455 S.W.2d at 717; *Travelers Insurance*, 380 S.W.2d at 612-13. The hot oil at issue here is similarly incapable of simple storage on a job site, but the Court has no facts that would indicate where the oil was ultimately to be used. In other words, where in the asphalt plant could the oil be said to be ultimately used, such that the Court could find the unloading process had concluded? If there were a malfunction in a later portion of the plant, could that be excluded as a use of an auto as well? Plaintiff's concern that without such a determination of a final delivery point any malfunction on the asphalt plant could be subsumed within the auto exclusion is a valid one, and difficult to answer. One plausible answer might be, as Plaintiff argues, to find the end of the hose to be the delivery point, since it is at least a clear point at which to draw the line. Another plausible answer might be that the oil reservoir should be the ultimate delivery point, though without further facts on how the plant functions, and how long the oil may rest in the reservoir, it is difficult to say for certain.

However, the Court need not look for further facts or try to fix a delivery point somewhere in the plant. The Texas Supreme Court addressed an argument similar to this, too, and rejected it as well. In *Travelers Insurance*, the truck insurer argued that the final delivery point was the bucket of the crane, since that was where the user took the goods from the deliverer. 380 S.W.2d at 613. But the court instead held,

"The bucket cannot be considered 'the place to which' the concrete was being delivered. It was merely the necessary conduit by which the concrete was conveyed to its place of delivery. The trip in the bucket to such place of delivery was merely an incident in the unloading operation. Indeed, because of the manner of the operation, the truck could not have been unloaded other than by the repeated trips of the bucket from the truck to the place of use of the concrete. The employment of the crane and the bucket was just as essential a part of the complete operation of unloading as was the discharge of the concrete from the truck into the bucket. The means by which the material is removed from a truck is of no particular consequence, whether the removal be effected by a rack, by hand or by a crane. The sole test is whether the means used was in the process of unloading. In this case the bucket was merely an instrument to effect the unloading."

*Id.* (quoting *Lamberti v. Anaco Equip. Co.*, 226 N.Y.S.2d 70, 73 (N.Y. App. Div. 1962) (ellipses omitted).

Similarly, Plaintiff argues that the delivery point was the end of the hose. But the oil could not be unloaded from the truck and into the asphalt plant except by use of a pump; the pump and hose were as essential parts of the unloading as was the discharge of the oil out of the truck. Thus, the hose was merely an implement being used to take the oil to its delivery point, and cannot be the delivery point itself.

Also, as a matter of logic and law, wherever the final delivery point in the asphalt plant might be, the unloading of the truck could not be complete until all of the oil had left the truck and reached that point. *See Commercial Standard*, 455 S.W.2d at 717. But the parties agree that at the time the accident occurred, the unloading was still taking place. Facts ¶ 10. In other words, even if Plaintiff's argument were true that the hose was the final delivery point, by conceding that the unloading was ongoing, Plaintiff also concedes that some of the oil had not yet reached the hose and was still in the truck. As the Texas Supreme Court put it in *Commercial Standard*, "It is clear, and the facts are undisputed, that only a part of the load had been discharged at the time of the accident; the 'unloading' had not been completed." 455 S.W.2d at 717. Just as there it was irrelevant whether a contractual F.O.B. delivery term had

been satisfied so long as there was still concrete in the truck, here it is irrelevant where the ultimate delivery point might be so long as there was still oil in the truck and the unloading was ongoing. All of the oil could not possibly have reached its final delivery point, so as a matter of law the unloading was not complete.

### 3. Exception to the auto exclusion

Plaintiff next argues that even if the auto exclusion operates to defeat coverage for the accident, an exception to that exclusion operates to bring the accident back within the scope of coverage. Plaintiff bears the burden of proving an exception applies. *Gilbert*, 327 S.W.3d at 124. But in order to understand Plaintiff's argument, an exegesis of the byzantine construction of the Policy in this area is required.

In essence, there are two ways for a vehicle to qualify as an "auto" under the Policy. A vehicle can be an auto if it meets the primary definition of "a land motor vehicle, trailer or semitrailer designed for travel on public roads, including any attached machinery or equipment." Policy 20. However, certain types of equipment which would otherwise meet this definition are not classified as autos and are instead classified as "mobile equipment." And, a subset of this mobile equipment category is then removed from the mobile equipment definition and placed back into the category of autos under a secondary definition. As the Policy puts it,

> However, self-propelled vehicles with the following types of permanently attached equipment are not 'mobile equipment' but will be considered 'autos':
> . . . .
> [f.](2) Cherry pickers and similar devices mounted on automobile or truck chassis and used to raise or lower workers; and
> [f.](3) Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment.

*Id.* at 22.

Despite placing this secondary type of vehicles in the definition of autos, the Policy excepts

20

some of them from the reach of the auto exclusion. In the language of the Policy, "This [auto] exclusion does not apply to: . . . (5) 'Bodily injury' or 'property damage' arising out of the operation of any of the equipment listed in f.(2) or f.(3) of the definition of auto equipment." *Id.* at 14. The end result, then, is that there are two categories of autos: first, the general class of land motor vehicles, minus vehicles qualifying as mobile equipment; and second, the carve out from mobile equipment that is placed back into the auto definition. The first category of autos is excluded from coverage under the Policy, but a portion of the second category is included in coverage.

Plaintiff argues that the asphalt plant is an auto under the second category, so that the injuries arising from the pump attached to the asphalt plant are excepted from the Policy's auto exclusion, meaning they are covered. Pl.'s Mot. 7-93 This argument appears to be based on the fact that the oil reservoir section of the plant once rested on wheels, and on a grammatical analysis of the relevant Policy language. *Id.*; Pl.'s Resp. to Def.'s Mot. 11-13. But Plaintiff's argument is unavailing; as the Court reads it, the asphalt plant does not qualify as an auto under the secondary definition. First, the oil reservoir section of the plant was, at the time of the accident, attached to the rest of the asphalt plant, and its wheels had been removed. Facts ¶ 8. Thus, while the oil reservoir may have once been a mobile vehicle, it was not one at the time of the accident. Second, there is no indication that the reservoir ever was self-propelled, and certainly no indication that it was capable of self-propulsion at the time of the accident. *Id.* The parties have even stipulated that it was not. *Id.* As set forth above, the Policy only excepts self-propelled vehicles from the reach of the auto exclusion, so it necessarily follows that the oil reservoir section of the asphalt plant does not qualify for the exception.

Plaintiff argues that the secondary definition of auto was somehow meant to include non-

self-propelled vehicles based on the idea that it makes no sense for the Policy to include vehicles in the definition of auto if those same vehicles are then excepted from the effect of the auto exclusion. Pl.'s Resp. to Def.'s Mot. 11. To reframe Plaintiff's argument, why specify the second class of vehicles that will be autos only to immunize them from the policy provisions applicable to autos? On its face it does appear nonsensical to include something in a category but then exclude it from the effects of a rule that otherwise applies to that category. If the second class of vehicles were not brought within the category of autos, they would not be excluded from coverage by the auto exclusion in the first place, and thus would not need the protection of the exception. However, the second class of vehicles, if not removed from the category of mobile equipment somehow, would still be subject to the mobile equipment exclusion. *See* Policy 14 (setting forth the mobile equipment exclusion). Thus, while Plaintiff's intent-based argument has a certain appeal, it does not square with the language of the Policy as written. The various layers of exclusion and exception are complex, but the end result is that the Policy covers injuries arising out of the use of self-propelled vehicles with permanently attached cherry pickers, compressors, pumps, and the like by exempting them from the reach of the auto exclusion. While the Court might write the Policy differently to achieve this outcome, the Policy language unambiguously leads to this result, which is sufficient.[2]

C. **Dovetailing of Policies**

Both parties spend considerable time discussing how other possibly applicable insurance policies bear on the interpretation of this Policy. Defendant argues in its Motion that the broad reach of the auto exclusion in CGL policies is meant to correspond with the equally broad reach

---

[2]     Because the Court finds that there was no covered cause of the accident under the exception, it does not reach Defendant's argument regarding concurrent causation.

of the coverage of auto liability policies, so that the auto liability policy on the truck would likely cover the injuries to Plaintiff. Def.'s Mot. 7-9. Plaintiff argues that this concept of corresponding coverage and exclusion terms, which is described in various cases as "dovetailing," is only meant to apply to situations where the same party obtains both CGL and auto policies, so that the insured gets full coverage but not double coverage. Pl.'s Resp. To Def.'s Mot. 4-5. Plaintiff also points out that the already broad auto exclusion in the standard form CGL policy was expanded even further by an endorsement in the Policy here, indicating that Defendant's intention was not to provide seamless insurance coverage for Villegas, but instead to leave a gap in coverage for which Villegas would be uninsured. *Id.* at 5 (noting that the original policy only excluded autos owned or operated by the insured, but was expanded to exclude any auto).

Defendant is correct that Texas courts have interpreted the auto exclusion in CGL policies with an eye to the coverage language of auto liability policies. As the Texas Supreme Court put it in *Commercial Standard*,

> Prior to the addition of the loading and unloading endorsement to the automobile liability policy, neither the automobile policy nor the standard liability policy clearly defined which insurer had liability coverage for injuries sustained upon premises of one who was insured under a general liability policy during the loading and unloading of a vehicle not owned or hired by the general liability insured and an insured under a standard automobile liability policy. This question has been settled by the addition of the loading and unloading clause. The automobile liability insurer would provide coverage for injuries sustained as a result of negligence in the loading and unloading of the vehicle.

455 S.W.2d at 717.

Similarly, the Fifth Circuit has stated in dicta regarding another scenario involving auto and CGL policies,

> If the Auto Policy did not cover the occurrence because the injury did not arise from the use of a covered auto, then the CGL Policy exclusion of injuries arising from the use would not have applied and the claim would have been covered -

> absent another exclusion. The two policies together created a range of coverage for [the insured].

*Employers Mut. Cas. Co. v. Bonilla*, 613 F.3d 512, 516 (5th Cir. 2010).

Finally, the only case law *Bonilla* relies on for its dovetailing analysis is an earlier Fifth Circuit case, *Travelers Indemnity Company v. Citgo Petroleum Corporation*. *See id.* (citing *Travelers Indem. Co. v. Citgo Petroleum Corp.*, 166 F.3d 761, 769 (5th Cir.1999)). There, the Fifth Circuit held that where the same insurer had provided an auto and a CGL policy to one insured and the language of coverage under the auto policy was "virtually identical" to the language in an exclusion in the CGL policy,"[a] single accident could not be covered by both [policies]." *Citgo*, 166 F.3d at 769.

In general, it is entirely possible that an insured would not want to pay for double coverage and thus would buy policies with dovetailing but not overlapping coverage. In *Citgo*, for example, the policies were both issued by the same insurer, to the same insured, using identical language. *Id.* at 763. Such facts plausibly gave rise to an inference that the parties intended the two policies to dovetail and not overlap or have gaps. But when there is no evidence of the terms of the other policies or the parties' consideration of those other policies' terms when fashioning coverage, the Court is hesitant to determine the reach of coverage of a specific policy by looking at the terms of those other policies. The fundamental point when interpreting an insurance policy is to determine what coverage the insurer and premium-payer agreed would be provided. *See Lindsey*, 997 S.W.2d at 158. Other policies should only be relevant insofar as they are specifically shown to have been contemplated by the parties when fixing the limits of coverage in their own policy.

The problems inherent in using a dovetailing analysis without evidence of such contemplation is illustrated by the facts of the present case. To interpret the Policy as creating a "range of coverage" between the Policy and the auto policy on the oil truck, the Court would

need evidence of the terms of both policies, which it does not have.  The Court would also need evidence from which to at least infer that Villegas and Defendant negotiated the terms of the Policy with the coverage of that auto policy in mind, which is likewise lacking.  Proof of such forethought seems unlikely to arise in the present scenario, since it would require Villegas and Defendant to be aware in advance of the terms of the auto policy covering the oil truck, and it is not apparent how they could have acquired such knowledge.  It would also mean Villegas and Defendant established the reach of the auto exclusion in the Policy knowing that Villegas could always take refuge under the auto policy in the event of an accident arising from the unloading of an oil truck, which is similarly unlikely.

Even if the oil truck insurance policy were based on a standard form, such terms could always be changed by an endorsement, which Villegas might not be aware of.  After all, Plaintiff aptly points out that the Policy itself was altered by endorsement to create a broader auto exclusion than originally appeared in the standard form CGL policy.  Pl.'s Mot. 5.  The Court has no evidence that a corresponding endorsement was made to expand the reach of the truck's auto policy.  Whatever assumptions the Court might make about the corresponding terms in standard form CGL and auto policies are completely untenable here, where the language in one of those policies is altered and the language of the other is unknown.  It is impossible to say on these facts that Villegas intended to create a seamless "range of coverage," since the Policy creates a larger exclusion from coverage than the coverage likely provided in the standard form auto policy applicable to the truck.

In short, Defendant is incorrect when it says that the lack of an auto policy before the Court does not diminish the significance of dovetailing analysis.  Def.'s Resp. to Pl.'s Mot. 9, ECF No. 21.  Unlike in *Bonilla*, the parties have not presented any evidence of the language of any auto policies that might apply.  *Cf. Bonilla*, 613 F.3d 515-16 (quoting language from a CGL

and an auto policy).[3] Plaintiff might very well be correct that by expanding the auto exclusion through an endorsement, Defendant intended for Villegas to be uninsured for accidents arising from the unloading of supplies from a third party's auto, even when the root cause of those accidents arose from Villegas's asphalt plant. *See* Pl.'s Resp. to Def.'s Mot. 5. But the Court has no evidence from which to judge the parties' intent behind the Policy, merely the language of the Policy itself. The Court questions whether Villegas would have intended to obtain coverage limited in this manner, but the Policy unambiguously excludes coverage for such incidents. It is ultimately irrelevant here whether Defendant assumed that Villegas would be covered under the truck's policy or intended to leave Villegas uninsured for this kind of peril; the terms of other policies do not matter. The Court concludes that this Policy does not cover the accident that occurred, and that is sufficient to resolve the present dispute.

## III.     CONCLUSION

For the reasons set forth above, Plaintiff's Motion, ECF No. 19, is **DENIED** and Defendant's Motion, ECF No. 22, is **GRANTED**.

**SO ORDERED.**

**SIGNED** on this 24th day of June, 2011.

KATHLEEN CARDONE
UNITED STATES DISTRICT JUDGE

---

[3] The Court notes that the language in the policies in *Bonilla* were not identical or nearly so. The terms of the CGL policy there excluded coverage for accidents "'arising out of the ownership, maintenance, use or entrustment to others of any auto owned or operated by or rented or loaned to any insured.'" 613 F.3d at 515 . The auto policy only covered claims "'resulting from the ownership, maintenance or use of a covered auto.'" *Id.* Even minor differences in language, such as the use of "arise out of" instead of "resulting from," can be significant. *See Utica Nat. Ins. Co. of Tex. v. Am. Indem. Co.*, 141 S.W.3d 198, 203 (Tex. 2004) (drawing a distinction based on the use of "arise out of" and "due to").